FILED

2006 SEP 12  AM 8: 43

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERTHA WASHINGTON, individually and as Successor in Interest to the Estate of Marshawn Washington, MARSHAWN WASHINGTON, JR., an individual and minor, by and through his guardian ad litem Theresa Cole,<br><br>                                    Plaintiffs,<br><br>        vs.<br><br>COUNTY OF SAN DIEGO, a municipal corporation, PETER ASTUTO, an individual, K. CARSON, an individual, LUIS CARRILLO, an individual, JUAN CORIA, an individual, GARY ROGERS, an individual, JOHN RUSSELL, an individual, ALLEN GRIFFIN, an individual, JAMES KELLEY, an individual, PABLITA CORRALES, an individual, MYRNA PASILLAS (sic), an individual, JOSEPHINE JANSSEN, an individual, BLESIDA (sic) MAAGHOP, an individual, CLARISA (sic) CAGAWA (sic), an individual, and DOES 1-100, inclusive,<br><br>                                    Defendants. | CASE NO. 02CV0143-LAB (JMA)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

        This case arises from wrongful death claims in connection with the death of Marshawn

Washington ("Mr. Washington") while in custody in the George Bailey Detention Facility.

02CV0143

1   Washington's widow, Bertha Washington, and son, Marshawn Washington, Jr. ("Plaintiffs"),[1] are the

2   remaining Plaintiffs in this case.  Remaining Defendants in this case are the County of San Diego (the

3   "County"); Peter Astuto, K. Carson, Luis Carillo, Juan Coria, Gary Rogers, John Russell, and Allen

4   Griffith (the "Deputy Defendants"); and Pablita Corrales, Myrna Psillas, and Josephine Janssen (the

5

6   "Nursing Defendants").

7   **I.       FACTUAL AND PROCEDURAL BACKGROUND**

8           Marshawn Washington was a 26-year old inmate at the George Bailey Detention Facility,

9   which is operated by the County.  At approximately 2:30 a.m. on February 2, 2000, deputies conducted

10  a surprise search for a razor in the module where Washington was housed.  According to the report

11  of Deputy Gianmarino, who was involved in the search, they had found the razor; however, they

12  continued the search to see what other contraband they might discover.  In Washington's cell the

13  deputies found nude photographs and confiscated them.  Marshawn Washington, who said they were

14  photographs of his wife, complained.  He was handcuffed and led out of the housing module to the

15  medical section of the building.

16          Although Marshawn Washington continued to complain about the pictures, he complied with

17  the deputies' directions when he was led out of the housing module.  Much of what happened in the

18  medical section of the building is disputed.  However, all parties agree that the Deputy Defendants

19  were involved in restraining him in a four-point or "hogtie" restraint and putting a protective "spit

20  sock"[2] over his head; while the Nursing Defendants were involved in monitoring his physical

21  condition, reporting to the Deputy Defendants regarding his general medical condition, and later

22  attempting to resuscitate him.  Washington died that night while in a four-point restraint, shortly after

23  having complained repeatedly to the correctional officers that he was having trouble breathing.

24  Washington weighed approximately 270 pounds and stood approximately 6 feet tall.  Upon

25  Washington's death, the San Diego County Sheriff's Department conducted a homicide investigation

26  _____

27  [1]  In this Order, "Plaintiffs" refers solely to the two Plaintiffs whose claims are at issue here, *i.e.*, Bertha Washington and Marshawn Washington, Jr.  The remaining Plaintiffs have either settled or been dismissed.

28  [2] A "spit sock" is a piece of mesh fabric designed to be put over a prisoner's head, and to allow the prisoner to breathe but prevent the prisoner from spitting.

1    and the San Diego County Office of the Medical Examiner conducted the autopsy.  According to the

2    autopsy report, the cause of death was "cardiopulmonary arrest during maximum law enforcement

3    restraint."

4        On January 22, 2002, Plaintiffs Bertha Washington and Marshawn Washington, Jr. filed their

5    complaint in this case for damages in connection with the death of Marshawn Washington while in

6    custody in the San Diego County Jail.   On April 2, 2002, the County of San Diego moved to dismiss

7    the Complaint, and other Defendants joined in this motion.

8        On October 8, 2002, Judge James Lorenz granted in part Defendants' motion to dismiss.  On

9    November 15, 2002, Plaintiffs filed their Amended Complaint, which is now the operative complaint

10    in this action.  The Amended Complaint alleges both state and federal causes of action arising out of

11    Marshawn Washington's death.  All parties are represented by counsel.

12        Because of a conflict of interest among counsel for Defendants, the Court issued an order on

13    September 28, 2004 that, among other things, denied without prejudice all motions for summary

14    judgment.  Pending motions for summary judgment by Defendants were then denied as premature.

15        On March 24, 2006, the Deputy Defendants again moved for summary judgment, submitting

16    on previously filed moving papers.  On March 27, 2006, the Nursing Defendants likewise moved for

17    summary judgment or partial summary judgment, submitting on the same previously filed moving

18    papers as well as newly submitted moving papers and supporting documents.  On April 3, 2006, the

19    County moved for summary judgment or summary adjudication, filing new moving papers.  On April

20    13, Plaintiffs opposed the motions, submitting on previously filed papers.[3]  On April 17, Nursing

21    Defendants and Deputy Defendants replied to Plaintiffs' opposition.  On April 24 the County replied.

22    On April 26, the Court took these motions under submission.

23        On July 17, 2006, the Court granted in part Defendants' motion for summary judgment on the

24    claims of Odessa Washington and the Estate of Corline Butts.  By the Court's order signed August 11,

25    / / /

26

27        [3] In fact, Plaintiffs only specifically opposed the Deputy Defendants' motion.  However, the

28    Defendants understood this opposition as applying to all the motions, and submitted replies to Plaintiffs' opposition.  The Court will treat Plaintiffs' opposition as applying to all Defendants' motions for summary judgment, partial summary judgment, or summary adjudication, and will treat Defendants' replies as addressing Plaintiffs' opposition.

1    2006, the state law claims of Odessa Washington were then dismissed, all claims of the Estate of

2    Corline Butts were dismissed, and the Estate of Corline Butts was dismissed as a party.

3        On August 22, 2006, this Court by minute order issued a preliminary ruling on these motions

4    for summary judgment, and indicating that the Court would later issue an order explaining in detail

5    the reasons for its rulings.  The instant order explains those rulings and clarifies the minute order.

6    **II.    LEGAL STANDARDS**

7        Federal Rule of Civil Procedure 56(c) empowers the court to enter summary judgment on

8    factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive

9    determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  Summary

10   judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on

11   file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

12   that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Arpin*

13   *v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).  The moving party bears the

14   initial burden of demonstrating the absence of a "genuine issue of material fact for trial."  *Anderson*

15   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A fact is material if it could affect the outcome of

16   the suit under the governing substantive law.  *Id.* at 248.

17       "[S]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a

18   showing sufficient to establish the existence of an element essential to [her] case, and on which [she]

19   will bear the burden of proof at trial.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06

20   (1999), *citing Celotex*, 477 U.S. at 322.  *See also Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct.

21   1689, 1694 (1993).

22       The "mere existence of a scintilla of evidence" in support of the non-moving party's position

23   is not sufficient to withstand summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

24   (1986).  Accordingly, the non-moving party cannot oppose a properly supported summary judgment

25   motion by "rest[ing] on mere allegation or denials of his pleadings."  (*Id.* at 256.)

26       Even where plaintiffs are represented by counsel, as here, the Court construes civil rights

27   claims liberally.  *Holley v. Crank*, 400 F.3d 667, 674 (9th Cir. 2005).   The Court will not assume,

28   however, that Plaintiffs can prove facts that they have not alleged or that Defendants have violated

1  their or Mr. Washington's rights in ways that have not been alleged. *See Associated Gen. Contractors*

2  *of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

3  **III.    THEORIES OF RECOVERY**

4         The Amended Complaint specifically requests relief under eight theories.  Three are described

5  as claims under 42 U.S.C. § 1983: a claim for violation of the right of association, for wrongful death,

6  and for unenumerated civil rights violations.  However, the body of the complaint describes the § 1983

7  claims more broadly as including violations resulting from imposition of punishment without due

8  process of law, the imposition of cruel and unusual punishment, and excessive force.  The claim for

9  cruel and unusual punishment is described as a claim against personnel for both fatally battering Mr.

10  Washington and also refusing to provide him with medical assistance.  Therefore, it is subsumed

11  within the federal claims for refusing to provide Mr. Washington with medical assistance and for

12  excessive force.  The claim for imposition of punishment without due process of law does not fit the

13  facts of this case, because the test of whether the officers were authorized to apply force to Mr.

14  Washington in the manner they did is governed by the test for excessive force, as described below.

15  Therefore, this claim is subsumed within the excessive force claim.  With little explanation the

16  Amended Complaint also mentions violation of Fourth Amendment rights.[4]  Plaintiffs add a claim for

17  the deprivation of Plaintiffs' rights to the familial love, society, and companionship of Mr.

18  Washington. The Amended Complaint also alleges that the rights deprivation resulted from a custom,

19  policy, and practice of the San Diego Sheriff's Department of leaving prisoners in four-points

20  restraints without adequate monitoring and using "spit socks" on prisoners.

21  / / /

22  / / /

23  _____

24  [4] The Court assumes this is a misplaced reference to Mr. Washington's other Constitutional rights. As the Court noted in its October 8, 2002 order, Plaintiffs had made broad references to various Constitutional provisions, apparently on the basis that individual rights are protected by different

25  Constitutional provisions depending on the individual's custodial status.  Order of October 8, 2002, at 5 (noting that broad references to sections of the Constitution was not improper at the pleading

26  stage, although not all references in question applied to Mr. Washington.) Apparently, Plaintiffs meant to bring claims for violation of Mr. Washington's Constitutional rights that took the form of causing

27  him physical harm and eventually death.  In any case, Plaintiffs may not bring a Fourth Amendment claim for an unreasonable search and seizure, because "the Fourth Amendment proscription against

28  unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

- 5 -                                    02CV0143

1    Plaintiffs also join a California state wrongful death claim under Code Civ. Proc. § 377.60, as

2    well as California state claims for intentional infliction of emotional distress, battery, negligence *per*

3    *se*, and medical negligence.

4    Plaintiffs allege that the force used was unreasonable and applied with the intention of causing

5    Mr. Washington to suffer. Plaintiffs also allege that officers taunted Mr. Washington as he lay dying,

6    intending to cause him to suffer even more. Plaintiffs further allege that Defendants knew that

7    Marshawn Washington was in immediate need of medical care and failed to summon or provide it.

8    The claims are made generally against all Defendants. Apparently out of an abundance of

9    caution, the various Defendants have moved for summary judgment on all claims they perceive may

10   be construed to include them. However, on the basis of factual allegations, Defendants' motions for

11   summary judgment, and Plaintiffs' opposition to the motions for summary judgment, it is clear that

12   Plaintiffs do not mean to bring all claims against all Defendants. In any event, Plaintiffs have not

13   alleged facts that would support all claims against all Defendants.

14   Construing the Amended Complaint liberally, the Court understands the claims to be brought

15   against the various Defendants as follows. On the basis of alleged facts, the only claim that appears

16   to apply directly to the County is the claim that the County's policies resulted in Mr. Washington's

17   suffering and death. The Amended Complaint and motions suggest, however, that claims are being

18   brought against the County for vicarious liability as well, on the basis of the acts and omissions of the

19   Deputy Defendants and Nursing Defendants. The allegations against the Nursing Defendants appear

20   to relate to their alleged failure to summon medical assistance, their alleged medical negligence, their

21   alleged failure to prevent the Deputy Defendants from causing harm to Mr. Washington, and their

22   alleged responsibility for Mr. Washington's death (including denying Plaintiffs' familial rights).

23   Plaintiffs have not alleged that the Nursing Defendants improperly applied force to Mr. Washington,

24   affirmatively harmed him, or taunted him. Because the Nursing Defendants' involvement with Mr.

25   Washington was medical in character and they are not themselves alleged to have violated any non-

26   medical regulations applicable to them, claims for negligence *per se* as to them are subsumed within

27   the medical negligence claims. It is against the Deputy Defendants that the largest number of claims

28   / / /

1    are made.  The only claims that do not appear to apply to them are the claims regarding the County's

2    policies and medical negligence.

3           Plaintiffs seek punitive damages against all Defendants.  The Nursing Defendants and Deputy

4    Defendants in turn have moved for summary judgment as to these claims.

5           Other than Plaintiffs' claims for violation of their familial rights, all claims are brought on

6    behalf of Mr. Washington by his widow and putative successor in interest Bertha Washington.  Both

7    Bertha Washington and Marshawn Washington, Jr. bring a claim for violation of their familial rights.

8    **IV.    DISCUSSION**

9           **A.    Standing**

10          The Deputy Defendants' motion for summary judgment challenges Bertha Washington's

11   standing to bring claims as successor in interest to Mr. Washington.  Standing is a threshold

12   requirement, without which this Court lacks jurisdiction to decide these matters.  *Arakaki v. Hawaii*,

13   314 F.3d 1091, 1097 (C.A.9 (9th Cir. 2002).  The Court therefore turns to this question first.

14          The Deputy Defendants point out that Fed. R. Civ. P. 17(b) provides that the capacity of a

15   person to sue is determined by the law of that person's domicile.  Because Bertha Washington is

16   domiciled in California, California state law determines her right to bring claims on his behalf.  Under

17   California Code Civ. Proc. § 377.30, only a decedent's successor in interest or estate representative

18   can bring an action on behalf of the decedent.  Under § 377.32, "The person who seeks to commence

19   an action or proceeding or to continue a pending action or proceeding as the decedent's successor in

20   interest under this article, shall execute and file an affidavit or a declaration" attesting to certain facts

21   and meeting certain conditions.  Deputy Defendants argue that no such affidavit or declaration is on

22   file or was produced during discovery.  Plaintiff Bertha Washington contends she has complied with

23   this requirement, and attaches a declaration which is file stamped as having been filed in California

24   state court on January 18, 2002.

25          Defendants in their reply do not challenge this declaration or even mention it again, nor have

26   they attempted to point out that Bertha Washington lacks standing for any other reason.  Because the

27   declaration appears to be satisfactory, the Court concludes that Bertha Washington has as a preliminary

28   matter met the standing requirements to bring claims on behalf of Mr. Washington.

1    **B.    Claims Against the County**

2    The County has moved for summary judgment on all claims against it.

3    **1.    Federal Claims**

4    A public entity can be liable under § 1983 only where it has an official policy or an unoffical

5    custom that is the "moving force" behind a violation of Constitutional rights; otherwise, there is no

6    vicarious liability for public entities under § 1983. *Monell v. N.Y.C. Dept. of Social Svcs.*, 436 U.S.

7    658, 690–01 (1978). *Monell* liability requires a § 1983 plaintiff to prove four elements: (1) that he

8    possessed a constitutional right of which he was deprived; (2) that the government entity had a policy;

9    (3) that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4)

10   that the policy is the "moving force behind the constitutional violation." *Oviatt v. Pearce*, 954 F.2d

11   1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. at 389–91 (1989).

12   The County particularly attacks the third element, citing a ruling from this District Court ruling

13   in a previous case, *Price v. County of San Diego*, 990 F.Supp. 1230, 1238 (S.D.Cal. 1998), as well as

14   persuasive precedents in other courts. In *Price*, this District Court held that "the hogtie restraint in and

15   of itself does not constitute excessive force" on the basis of expert evidence presented in that case.

16   *Id.* The County also argues, citing *id.* at 1246, that because there was no underlying Constitutional

17   violation, *Monell* liability cannot attach; this argument is dealt with below.

18   A public entity's deliberate indifference "occurs when the need for more or different action is

19   so obvious, and the inadequacy of the current procedure so likely to result in the violation of

20   constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent

21   to the need." *Oviatt*, 954 F.2d at 1477–78 (quotations, alterations, and citations omitted).

22   Plaintiffs cite expert evidence, including a declaration and an article by Dr. Ronald O'Halloran,

23   to support their contention that the four-point restraint is inherently dangerous. In arguing for the

24   Deputy Defendants' liability, Plaintiffs allege that the County had a policy requiring monitoring of

25   prisoners being held in four-point restraint that the Deputy Defendants failed to follow. *See* Pls.'

26   Opp'n to Deputy Defendants' Mot. for Summ. J., at 6 (citing Pls.' Notice of Lodgment ("Pls.' NOL")),

27   Ex. UU, at 13–14. Plaintiffs also point to no evidence that the spit sock was dangerous. Therefore,

28   / / /

1  any *Monell* liability must be based solely on the County's policy of permitting the use of the four-point

2  restraint.

3      The dispositive issue here is whether the County deliberately disregarded Plaintiff's

4  Constitutional rights. While Plaintiffs present evidence from which a reasonable jury could conclude

5  that the four-point restraint was dangerous, they have not presented any evidence to show that in

6  permitting the four-point restraint, the County was "deliberately indifferent" to Mr. Washington's

7  Constitutional rights. Plaintiffs have pointed to medical evidence before *Price*'s issuance that might

8  support a finding that the four-point restraint was dangerous. However, the question is not whether

9  this form of restraint was dangerous.  Rather, the question is whether its use amounted to a

10  Constitutional violation, and furthermore whether the County was deliberately indifferent to the

11  violation. The medical evidence, however persuasive it might be regarding medical questions cannot

12  authoritatively show what the law was. While Plaintiffs were not parties to *Price* and therefore are not

13  bound by factual findings there, the point remains that *Price* stands as authority regarding what

14  prisoners' Constitutional rights are, or at least what they were understood to be when *Price* was issued.

15  There is therefore no evidence that up until the issuance of the *Price* opinion in 1998, the County had

16  any reason to believe the four-point restraint would violate prisoners' Constitutional rights.

17      Plaintiffs must therefore show that prisoners' Constitutional rights to be free from the four-

18  point restraint become obvious after the issuance of *Price*. *Oviatt*, 954 F.2d at 1477–78.  The only

19  publicly available post-1998 evidence Plaintiffs present to show the danger of the four-point restraint,

20  however, is an article by Dr. Ronald O'Halloran published in the American Journal of Forensic

21  Medicine and Pathology.  This article, however, is not strongly conclusive.  Further, it relies in part

22  on the research of Dr. Donald Reay, whose hypotheses of positional asphyxia in connection with the

23  four-point restraint were rejected by the Court in *Price*, 990 F.Supp. at 1238 (citing a university study

24  which "eviscerates Dr. Reay's conclusions" and noting that "Dr. Reay now concedes, the hogtie

25  restraint is 'physiologically neutral.') Standing alone, this article is inadequate to support a finding

26  that "the need for more or different action is so obvious, and the inadequacy of the current procedure

27  so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said

28  to have been deliberately indifferent to the need." *Oviatt*, 954 F.2d at 1477–78.  In addition, there is

1   no evidence to show that the County was aware of this article or any other post-*Price* information

2   about the dangers of the four-point restraint.

3        The Court has no occasion in this case to determine whether the County should or may

4   continue to use the four-point restraint, or under what circumstances it should or may be used. The

5   issue here is whether the County's policy at the time of Mr. Washington's death amounted to

6   "deliberate indifference" as required under *Oviatt*. Plaintiffs do not present evidence to support a

7   finding that the County's policy in place at the time of Mr. Washington's death amounted to deliberate

8   indifference to Mr. Washington's Constitutional rights.

9        In their opposition, Plaintiffs have attempted to augment their pleadings by arguing that the

10  County had a policy of not training its personnel regarding safeguards needed in connection with the

11  four-point restraint. In support of this, Plaintiffs point solely to statements by several of the Deputy

12  Defendants that they had not been so trained. Plaintiffs argue that this satisfies the requirement for a

13  *Monell* claim. In reply, the Count correctly points out that this theory is unsupported by allegations

14  in the Amended Complaint. As such, it would require an amendment to the Amended Complaint.

15  Because Plaintiffs have already amended their complaint once, additional amendment requires leave

16  of the Court or consent of the opposing party. Fed. R. Civ. P. 15(a). Plaintiffs have not sought the

17  Court's leave, and Defendants have not consented to the amendment. Therefore, this proposed new

18  theory will not be considered at this time.

19       Plaintiffs cannot establish the required "deliberate indifference" element for *Monell* liability

20  as set forth in *Oviatt*; thus, summary judgment on all federal claims is proper. *Cleveland*, 526 U.S.

21  at 805–06.

22           **2.      California State Claims**

23       Under California law, a governmental entity can be sued in tort only pursuant to an authorizing

24  statute or enactment. *Lopez v. Southern Cal. Rapid Transit Dist.*, 40 Cal.3d 780, 784 (1985). Under

25  Cal. Govt. Code § 844.6(a)(2), public entities are not liable for the injury or wrongful death of any

26  prisoner. *May v. County of Monterey*, 139 Cal.App.3d 717, 720–21 (1983).

27       The only identified statutory basis for the County's *respondeat superior* liability is Govt. Code

28  § 845.6, which provides for liability where government employees fail to summon medical care.

- 10 -                    02CV0143

1   Under this theory, the County could be liable if either the Deputy Defendants or the Nursing

2   Defendants, or both, knew or had reason to know that Mr. Washington was in need of immediate

3   medical care and failed to take reasonable action to summon such medical care.

4   As described in the analysis below, summary judgment is proper as to claims against the

5   Nursing Defendants, except to the extent it is claimed the Nursing Defendants failed to summon

6   needed medical care after Mr. Washington had stopped breathing.  However, summary judgment is

7   not appropriate on claims against the Deputy Defendants.  Therefore, the County's motion for

8   summary judgment is denied on the claim that its employees failed to summon medical care when

9   needed, but granted on all other state law claims.

10                  **3.      Punitive Damages**

11   Although Plaintiffs seek punitive damages against all Defendants, they have not alleged any

12   wrongful intent on the part of the County that would amount to oppression, fraud, malice, or any other

13   basis for awarding punitive damages.  (Am. Compl. at 15 (seeking punitive damages under a theory

14   that the conduct described in the wrongful death claim "amounts to oppression, fraud or malice" within

15   the meaning of Cal. Civ. Code § 3294).)  The Court therefore construes the Amended Complaint as

16   seeking punitive damages against Nursing Defendants and Deputy Defendants only.

17          **C.      Claims Against the Nursing Defendants**

18   Plaintiffs allege that at approximately 2:45 a.m., Defendant Astuto ordered the Nursing

19   Defendants to check Marshawn Washington's vital signs.  They allegedly did not check his blood

20   pressure, had difficulty finding a pulse, and noted only a faint carotid pulse.  Allegedly, although

21   Washington was unresponsive to verbal commands and tactile stimuli, the Nursing Defendants and

22   Defendant Astuto ordered that Washington be dragged into the safety cell, where he died.  Plaintiffs

23   allege that at approximately 3:05 a.m., the Nursing Defendants came in to check Washington's vital

24   signs but found no pulse.  Plaintiffs then allege that someone called out that Washington was not

25   breathing, and that one of the nurses was heard in the hallway, asking whether anyone knew how to

26   perform CPR.  Plaintiffs present evidence to show that after Marshawn Washington told  Deputy

27   Defendants he had asthma and was having trouble breathing, a deputy asked Defendant Janssen

28   whether he had asthma.  Plaintiffs present evidence to show that Janssen replied that Washington did

1   not, without asking why the information was needed and without notifying the Deputy Defendants that

2   Washington had recently had difficulty breathing due to pharyngitis.

3         Nursing Defendants, by contrast, in their motion for summary judgment point to evidence to

4   show that their involvement with Mr. Washington on the night of his death began after he was put in

5   the four-point restraint. According to their evidence, Defendant Corrales conducted the assessment

6   while Defendant Psillas observed. Corrales states that his color was normal and remained constant,

7   he was not cyanotic, his lip color was pinkish, his fingernail beds had normal capillary response, his

8   skin was warm, he was not choking, his airway was clear, his head was turned to one side, and his

9   nostrils had flaring movement. She reports finding a faint radial pulse and attributes the faintness to

10   the difficulty of locating the pulse due to the position of the handcuffs. She says the carotid pulse was

11   more rapid. Although she spoke to Washington, he did not answer, which she says is not unusual for

12   inmates following a confrontation. Based on her assessment, Corrales says she believed Washington

13   was not experiencing a medical emergency and could be moved into the safety cell.

14         Nursing Defendants allege that they next encountered Washington when the Deputy

15   Defendants were in the safety cell removing his clothing as a safety precaution, and noticed that he was

16   not breathing. Nursing Defendants say they were called, that Defendant Psillas checked for but was

17   unable to find a pulse, and that smelling salts elicited no reaction from Washington. They say that

18   Washington was then removed from the cell, his restraints were removed, and resuscitation efforts

19   were initiated. They add that their efforts included using artificial respiration and chest compressions,

20   application of an automatic defibrillator, obtaining telephonic instructions from a physician at the

21   University of California at San Diego Medical Center, and administration of intravenous medication.

22   An hour later, they report, Washington was pronounced dead.

23         Plaintiffs' federal claims against Nursing Defendants can be understood as a § 1983 claim for

24   violations of Mr. Washington's Eighth and Fourteenth Amendment rights, and interference with

25   Plaintiffs' rights to familial association. Plaintiff's state claims are for medical negligence resulting

26   in wrongful death, failure to summon medical assistance, intentional infliction of emotional distress,

27   and battery. Because the Nursing Defendants' involvement with Mr. Washington was entirely medical

28   / / /

02CV0143

1    in character, Plaintiffs bring no separate negligence *per se* claims against the Nursing Defendants. The

2    Nursing Defendants have moved for summary judgment for all claims against them.

### 1.    Federal Claims Against Nursing Defendants

#### a.    Deliberate Indifference to Serious Medical Needs

5    It is well established that the government is obliged "to provide medical care for those whom

6    it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "An inmate must rely

7    on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be

8    met." *Id.* Such deliberate indifference is an Eighth Amendment violation and is actionable under

9    § 1983. *Id.* at 105. To prove an Eighth Amendment violation for failure to provide medical care, a

10    plaintiff must demonstrate that the inmate was confined under conditions posing a risk of "objectively,

11    sufficiently serious" harm and that the officials had a "sufficiently culpable state of mind" in denying

12    the proper medical care. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002). Defendants do not

13    argue that Mr. Washington's condition did not pose a risk of objectively serious harm; rather, they

14    focus on the second, subjective element, which requires a showing of "deliberate indifference" — i.e.,

15    that the official knew of and disregarded an excessive risk to inmate health or safety. *See Farmer v.*

16    *Brennan*, 511 U.S. 825, 837 (1994).

17    Medical malpractice does not become a constitutional violation merely because the victim is

18    a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently

19    harmful to evidence deliberate indifference to serious medical needs. *Estelle*, 429 U.S. at 106.

20    "Deliberate indifference" requires proof that the official know of and disregard an excessive risk to

21    inmate health or safety. *Id.* A showing of deliberate indifference requires proof of two elements: (1)

22    the official must both be aware of the facts from which the inference could be drawn that a substantial

23    risk of serious harm exists, and (2) the official must also draw the inference. *Id.*

24    Plaintiffs do not allege that the Nursing Defendants affirmatively harmed Mr. Washington, but

25    rather that they neglected to provide him medical assistance they knew was needed. "[A] finding that

26    the inmate was seriously harmed by the defendant's action or inaction tends to provide additional

27    support to a claim that the defendant was deliberately indifferent to the prisoner's medical needs: the

28    fact that an individual sat idly by as another human being was seriously injured despite the defendant's

   02CV0143

1   ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the

2   prisoner's suffering." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir.1992), *overruled on other*

3   *grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (citation and quotation

4   marks omitted).

5          Although the evidence is in conflict, Plaintiffs point to evidence from which a jury could find

6   that Defendant Janssen disregarded a known serious risk to Mr. Washington's health or safety.

7   Bearing in mind the hour, the goings on, and the fact that a deputy allegedly asked Janssen whether

8   Mr. Washington had asthma, a jury could find that Defendant Janssen knew there was a serious risk

9   that Mr. Washington was having trouble breathing, and that she gave only a minimal answer without

10  making what are arguably obvious inquiries.  A reasonable jury could find that in failing to inquire

11  what the reason for the question was, or whether Mr. Washington was having trouble breathing, or to

12  go beyond the deputy's limited question and point out that Mr. Washington had recently had

13  pharyngitis and had reportedly had trouble breathing, Defendant Janssen was not only medically

14  negligent but also deliberately indifferent to a risk of serious harm.  Furthermore, the Deputy

15  Defendants, in their defense, have alleged that the Nursing Defendants cleared Mr. Washington to be

16  moved into the safety cell while still restrained.  This, combined with evidence from which a jury

17  could conclude that Mr. Washington was not breathing or responsive at the time the clearance was

18  given, would support a finding of either medical negligence or deliberate indifference.

19         Plaintiffs also point to evidence to show that, upon discovering that Mr. Washington was not

20  breathing or responsive and had either a faint pulse or no pulse, Nursing Defendants delayed starting

21  CPR by at least five and possibly as much as seventeen minutes.

22         Plaintiffs have provided expert evidence in the form of a declaration from a licensed nurse to

23  show that Nursing Defendants' response to the situation was far below the expected standard of care.

24  (Pls.' NOL, Ex. D.)  This declaration, after citing to medical records, opines that "[t]he delay in

25  responding in a critical emergency situation is shamefully below the standard of care." (*Id.* at 3.)

26  Nursing Defendants argue that their actions were the result of their exercise of medical judgment, and

27  that the evidence is inadequate to show deliberate indifference.  Plaintiffs' expert witness Dr. Corey

28  Weinstein, M.D., declared that within four to five minutes of a cardiopulmonary arrest, "irreparable

1   damage occurs in the brain and other organs." He also declares that this is why medical personnel

2   must have access to a prisoner within four minutes. (Pls.' NOL, Ex. B, at 3.)

3       Even though the evidence is in conflict and could be interpreted in a number of ways, a jury

4   could find that the Nursing Defendants' response was so obviously below the standard that their failure

5   to provide Mr. Washington with adequate care, or their delay in providing it, exhibited deliberate

6   indifference. *See McGuckin*, 974 F.2d at 1060–61 (holding that a delay in providing needed medical

7   care could constitute deliberate indifference, and that even a single failure to provide proper treatment,

8   if egregious, could show that a defendant's actions were motivated by deliberate indifference to the

9   prisoner's medical needs). Because Mr. Washington's medical needs involved difficulty breathing

10  while being restrained, unconsciousness, and little or no detectible heartbeat, they were obviously

11  medically serious. As the medical need increases in seriousness, the possibility of proving deliberate

12  indifference also increases. *Id.* at 1061.

13      There is no vicarious § 1983 liability; this section imposes liability only on a defendant who

14  causes a civil rights violation. *Palmer v. Sanderson*, 9 F.3d 1433, 1437–38 (9th Cir. 1993). Nursing

15  Defendants argue that Plaintiffs bear the burden of showing each Defendant's individual indifference.

16  However, the evidence Plaintiffs present is sufficient to support a finding of deliberate indifference

17  by any or all of the Nursing Defendants, based on the involvement of each.

18      For these reasons, summary judgment on § 1983 claims against the Nursing Defendants arising

19  from alleged failure to provide adequate medical care is not appropriate.

20                              **b.    Excessive Force**

21      Although this claim is alleged against all Defendants, the factual allegations only identify

22  actions taken by the Deputy Defendants. The Nursing Defendants rely on this point in their motion

23  for summary judgment. Plaintiffs oppose this motion, however, arguing that the nurses should have

24  prevented the Deputy Defendants from using excessive force but that they instead allowed it to

25  continue and ratified it.

26      Although there is no respondeat superior liability under § 1983, the Nursing Defendants could

27  be liable if they caused or participated in constitutional violations. *Cf. Barren v. Harrington*, 152 F.3d

28  1193, 1194 (9th Cir. 1998) ("Liability under § 1983 must be based on the personal involvement of the

- 15 -                                                        02CV0143

1   defendant.") with *Kwai Fun Wong v. U.S.*, 373 F.3d 952, 966 (9th Cir. 2004) (holding that the

2   requisite causal connection could be established by showing either personal involvement, or by

3   showing that a defendant set in motion a series of acts by others which the actor knew or reasonably

4   should have known would cause others to inflict the constitutional injury.) For example, a supervisor

5   could be liable for the acts of those he supervised if he ordered or consented to them. *Buckley v.*

6   *Gomez*, 36 F. Supp. 2d 1216, 1221 (S.D.Cal. 1997) ("[T]o avoid section 1983's respondeat superior

7   bar, the plaintiff must allege personal acts by the defendants which have a direct causal connection to

8   the constitutional violation at issue. At a minimum, this requires an allegation that the defendant

9   ordered, knew of or consented to the alleged violation.")

10          Here, Plaintiffs are opposing the motion for the summary judgment on the grounds that the

11   Nursing Defendants knew Mr. Washington was being held in the four-point restraint on his stomach,

12   and that his weight and size made this a dangerous position. They also allege that the Nursing

13   Defendants should have intervened and required the Deputy Defendants to position Mr. Washington

14   on his side and/or monitor him.

15          Undisputed evidence shows that the Nursing Defendants were not directly involved in the

16   situation until after Mr. Washington was put in the four-point restraint. Although neither party points

17   to evidence showing what formal authority, if any, the Nursing Defendants had in this situation, the

18   Court will assume for purposes of this analysis their instructions would have carried some weight with

19   the guards.

20          "[W]henever prison officials stand accused of using excessive physical force in violation of

21   the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied

22   in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

23   *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

24   The relevant standard "takes into account such facts as the need for the application of force, the

25   relationship between the need and the amount of force used, the threat perceived by the officer, any

26   effort to temper the severity of the forceful response, and the extent of the injury inflicted, and whether

27   the force was applied for a legitimate purpose." *Hydrick v. Hunter*, 449 F.3d 978, 1001 (9th Cir. 2006)

28   (citing *Hudson*, 503 U.S. at 7.)

- 16 -

1    Here, however, there is no evidence that the Nursing Defendants were involved in or knew the

2    details of the altercation with Mr. Washington.  There is likewise no evidence that they exercised any

3    judgment regarding whether it was necessary to restrain Mr. Washington in order to restore discipline,

4    or that their role in the situation had anything to do with disciplinary decisions.  Even assuming the

5    Nursing Defendants were deliberately indifferent to Mr. Washington's medical needs, as discussed

6    above, there is no showing that they were responsible for the disciplinary decision that brought those

7    medical needs about.  Their alleged involvement in the force applied to Mr. Washington consisted

8    solely of medical care decisions.   Summary judgment is therefore appropriate for the Nursing

9    Defendants on this claim.

10                    c.       **Interference With Familial Relations**

11    Plaintiffs bring this Fourteenth Amendment claim on their own behalf, for denial of their own

12    rights as family members of Mr. Washington. *Moreland v. Las Vegas Metropolitan Police Dept.*, 159

13    F.3d 365, 371 (9th Cir. 1998).  The standard for such a claim is very high in emergency situations such

14    as this, requiring a showing that Defendants acted, not merely with conscious indifference, but out of

15    a "purpose to commit harm." *Id.* at 373 (citing *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)).

16    While there is evidence from which a jury could infer that the Nursing Defendants were

17    deliberately indifferent to a serious risk of harm to Mr. Washington, there is no evidence to show that

18    they acted with a purpose was to commit harm to him.  Confronted with this argument, Plaintiffs are

19    unable to point to any evidence, and instead simply argue that the Nursing Defendants' mental state

20    is a question for the jury.

21    Fed. R. Civ. P. 56, as interpreted by *Celotex*, 477 U.S. 317, provides specific guidance in this

22    situation.  The burden of production imposed by Rule 56 requires the moving party to make a prima

23    facie showing that it is entitled to summary judgment. *Celotex*, 477 U.S. at 331.  This requirement can

24    be satisfied by pointing out to the district court that there is an absence of evidence to support the

25    nonmoving party's case. *Id.* at 325.  Once the moving party has made a prima facie showing that it is

26    entitled to summary judgment the burden shifts to the nonmoving party to produce evidentiary

27    materials that demonstrate the existence of a genuine issue for trial or to submit an affidavit requesting

28    additional time for discovery. *Id.* at 331.  Here, by pointing out the lack of evidence to show that they

1   had a purpose to commit harm, the Nursing Defendants have made a prima facie showing that they are

2   entitled to summary judgment.  This shifts the burden of production to Plaintiffs, who have neither

3   produced evidence showing the existence of a genuine issue for trial nor requested additional

4   discovery.  Therefore, summary judgment for the Nursing Defendants is appropriate as to this claim.

5                          **c.**     **Qualified Immunity**

6        Nursing Defendants argue that qualified immunity shields them from liability for alleged

7   violations of Mr. Washington's or Plaintiffs' federal rights.  Qualified immunity is intended to protect

8   a government official, not merely from liability, but from the burdens of standing trial; therefore the

9   Court addresses this issue immediately.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

10        In deciding this issue, the Court first addresses a threshold question: Taken in the light most

11   favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a

12   constitutional right?  *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).

13   Assuming that the answer is yes, the Court then asks whether the right was clearly established.

14   *Saucier*, 533 U.S. at 201.  "The relevant, dispositive inquiry in determining whether a right is clearly

15   established is whether it would be clear to a reasonable officer that his conduct was unlawful in the

16   situation he confronted."  *Id.* at 202.  "If the officer's mistake as to what the law requires is reasonable,

17   however, the officer is entitled to the immunity defense.  "If the officer's mistake as to what the law

18   requires is reasonable, however, the officer is entitled to the immunity defense."  *Id.* at 205.  The Court

19   is mindful of the Supreme Court's caution that the conduct must be judged from the perspective of an

20   officer in the situation at the time, without the benefit of the "20/20 vision of hindsight."  *Id.*

21        As the analysis above shows, taken in the light most favorable to Plaintiffs, the facts alleged

22   would show that the Nursing Defendants violated Mr. Washington's Eighth Amendment rights to

23   adequate medical care. Assuming that Plaintiffs' evidence is to be believed, the situation confronted

24   by the Nursing Defendants required their immediate intervention, yet their response was "shamefully

25   below the standard of care." (Pls.' NOL, Ex. D, at 3.)  In particular, there is evidence to support a

26   finding that the Nursing Defendants cleared Mr. Washington for placement in a safety cell even though

27   he was unresponsive, and then failed to call for assistance or begin administering CPR for at least five

28   minutes, and possibly as long as seventeen minutes.  Even assuming that the delay was as short as five

1   minutes, there is evidence to support a finding that the Nursing Defendants would have known that

2   this was too long. *See* Pls.' NOL, Ex. B, at 3 (declaration of Dr. Weinstein that the standards in penal

3   institutions require that response time be under four minutes.)   Assuming these facts to be true, the

4   Court finds that reasonable officers under those conditions would have known that their conduct was

5   unlawful.

6       Failing to provide minimally adequate medical care as described, even bearing in mind the

7   emergency conditions and the short time frame, would be constitute a clear violation of Mr.

8   Washington's Eighth Amendment rights.   For these reasons, summary judgment on the basis of

9   qualified immunity is denied.

10                      **2.      State Law Claims**

11                          **a.      Intentional Infliction of Emotional Distress**

12      Nursing Defendants ask that summary judgment be granted as to them on this state law claim.

13  "The elements of a prima facie case for the tort of intentional infliction of emotional distress are: (1)

14  extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard

15  of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme

16  emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's

17  outrageous conduct." *Cervantez v. J. C. Penney Co.*, 24 Cal.3d 579, 593 (1979).

18      The Nursing Defendants point out that in its order of October 8, 2002, the Court granted

19  Defendants' Rule 12(b)(6) motion on Plaintiffs' claim of intentional infliction of emotional distress,

20  and struck the references to emotional distress damages.  However, the Court explained that this could

21  only be brought as a derivative claim, and not on behalf of the Plaintiffs for their own pain and

22  suffering.  Order of October 8, 2002, at 6:15–19. The Court gave Plaintiffs leave to amend their

23  complaint to correct this error.

24      The Nursing Defendants also argue that there is no evidence to support the required elements.

25  The evidence shows that the Nursing Defendants became involved only after Mr. Washington was

26  relatively subdued.  Even accepting Plaintiffs' account of events, the evidence shows that the only

27  contacts Nursing Defendants had with Mr. Washington while he was responsive were Nurse Janssen's

28  alleged report on his history of breathing problems, and the examination of him by the other Nursing

1  Defendants, at which Nurse Janssen was not present.  Evidence that might show the existence of the

2  first element, "extreme and outrageous conduct by the defendant with the intention of causing, or

3  reckless disregard of the probability of causing, emotional distress," is thin at best.

4       In addition, after Mr. Washington was unresponsive, there is no evidence to show that he was

5  in emotional distress.  Plaintiffs suggest the event of dying can be inferred to be emotionally

6  distressing, but this goes too far.  Plaintiffs offer no evidence that death itself should be considered an

7  emotionally distressing event by a decedent, particularly where, as here, the decedent appears to be less

8  than fully conscious.  *See Hurlbut v. Sonora Community Hospital*, 207 Cal.App.3d 388, 397–402

9  (Cal.App. 5 Dist.,1989) (reversing award of damages for emotional distress, where evidence showed

10  that the patient was less than fully conscious during a surgical procedure).  Most significantly,

11  however, Plaintiffs offer no evidence that anything the Nursing Defendants did or omitted to do caused

12  Mr. Washington emotional distress.  At most, the jury would be left to speculate what Mr. Washington

13  was thinking or feeling after the Nursing Defendants became involved, and how their actions or

14  inaction might have caused it.

15       Therefore, summary judgment for the Nursing Defendants is appropriate as to this claim.

16                    **b.      Failure to Summon Medical Care**

17       The Nursing Defendants have moved for summary judgment on this claim.  In their Amended

18  Complaint, Plaintiffs do not plead this as a separate cause of action, but rather as part of the claim for

19  negligence *per se*, along with allegations of failure to provide Mr. Washington with adequate medical

20  treatment.  Plaintiffs have alleged that the Nursing Defendants can be held liable under this theory

21  because they failed to summon care when they first became aware that Marshawn Washington had a

22  serious medical need, as well as later, when he was unconscious and dying.  In reply, the Nursing

23  Defendants argue that they cannot be held liable for failing to summon medical assistance because they

24  themselves were providing the medical care.

25       Cal. Govt. Code § 845.6 provides that a public employee is generally not liable for injury to

26  a prisoner, except that the employee may be liable if the employee "knows or has reason to know that

27  the prisoner is in need of immediate medical care and he fails to take reasonable action to summon

28  / / /

- 20 -                                                  02CV0143

1  such medical care." This section also explains that it does not insulate public health care workers from

2  liability for professional malpractice.

3        With regard to most of the incidents on the night in question, the Nursing Defendants were

4  present with Marshawn Washington, and it is merely alleged they failed to provide him with proper

5  care. Plaintiffs' pleadings for medical negligence are premised on the assumption that the nurses were

6  medical care providers and were capable of providing medical assistance to Mr. Washington.

7  Therefore, the facts pleaded make clear the theory of recovery for most of the events of the night in

8  question is not that the Nursing Defendants failed to summon assistance, but that they failed to provide

9  him with assistance which they could have provided.  Plaintiffs' own expert evidence indicates that

10  at the early stages of this situation, the Nursing Defendants' errors were limited to failures to provide

11  the kind of care they were capable of providing, and should have provided.  If there is any evidence

12  showing that the Nursing Defendants should have called for outside assistance at the early stages,

13  Plaintiffs do not point it out.  The Nursing Defendants are thus correct with respect to most of the

14  events of the night in question.

15        However, Plaintiffs also present evidence to show that after Mr. Washington had stopped

16  breathing, the Nursing Defendants delayed for several minutes either commencing CPR or calling for

17  outside medical assistance.  Because Plaintiffs' expert evidence suggests that the Nursing Defendants

18  should have called for outside assistance, the jury could reasonably infer that their services alone

19  would not be considered sufficient.  This evidence can support a finding that the Nursing Defendants

20  failed to summon medical assistance when it was needed.

21        Therefore, summary judgment is proper except as regards the alleged delay in summoning

22  outside medical assistance after Mr. Washington had stopped breathing.

23        **c.**    **Battery**

24        Under California law, "battery is a violation of an individual's interest in freedom from

25  intentional unlawful, harmful or offensive unconsented contacts with his or her person." *Rains v.*

26  *Superior Court*, 150 Cal.App.3d 933, 938 (1984).  Except for physical contact in connection with

27  medical examinations, there is no evidence to show that any of the Nursing Defendants touched Mr.

28  Washington except when conducting examinations or providing medical care.  Plaintiffs do not

- 21 -

02CV0143

1   contend that these contacts were offensive or constituted battery.  As noted in the excessive force

2   analysis above, there is likewise no evidence that any of the Nursing Defendants caused any offensive

3   contact with Mr. Washington.  Therefore, summary judgment is proper on this claim.

4                               **d.        Medical Negligence**

5          Plaintiffs have argued that the Nursing Defendants' professional negligence contributed to Mr.

6   Washington's wrongful death.  A claim for professional medical negligence requires that the plaintiff

7   show a legal duty, breach of that duty, causation, and resulting damage. *Stafford v. Schultz*, 42 Cal.2d

8   767, 774 (1954).  Nursing Defendants argue that Plaintiffs can show neither breach of a duty, nor

9   causation.

10         With regard to medical negligence, for reasons discussed above, the Court finds that there is

11  sufficient evidence from which a jury could infer that the Nursing Defendants breached their duty of

12  professional care.

13         Causation is a more difficult issue.  Here, the cause of death has been identified as

14  "cardiopulmonary arrest during maximum law enforcement restraint."  There is evidence showing that

15  Mr. Washington was subjected to the four-point restraint and was in distress before the Nursing

16  Defendants were involved.  Under California law,

17         [c]ausation must be proven within a reasonable medical probability based upon
           competent expert testimony. Mere possibility alone is insufficient to establish a
18         prima facie case. That there is a distinction between a reasonable medical
           'probability' and a medical 'possibility' needs little discussion. There can be many
19         possible 'causes,' indeed, an infinite number of circumstances which can produce
           an injury or disease. A possible cause only becomes 'probable' when, in the
20         absence of other reasonable causal explanations, it becomes more likely than not
           that the injury was a result of its action. This is the outer limit of inference upon
21         which an issue may be submitted to the jury.

22  *Dumas v. Cooney*, 235 Cal.App.3d 1593, 1603 (1991) (quoting *Jones v. Ortho Pharmaceutical*

23  *Corp.*, 163 Cal.App.3d 396, 402–03 (1985)) (alterations omitted).

24         Plaintiffs are able to present evidence showing that the Nursing Defendants breached their

25  duty of care, and that Mr. Washington later died.  However, in cases where medical professionals

26  are responding to an already-existing condition, "Plaintiffs . . . are faced with the difficulty of

27  obtaining and presenting expert testimony that if proper treatment had been given, better results

28  would have followed." *Dumas*, 235 Cal.App.3d at 1603.

1    In response, Plaintiffs point to several expert declarations as well as a deposition transcript.

2    At least one of the declarations, that of Dr. Weinstein, identifies the nurses' failure to evaluate Mr.

3    Washington early as being a contributing cause to his death.  (Pls.' NOL, Ex. B, at 6) (declaring

4    that medical staff "failed to carry out their responsibility of identifying a medical emergency and

5    protecting their patient from harm" and that staff "created the circumstances of Mr. Washington's

6    emergency medical condition and then failed to respond appropriately resulting in his death.")

7    Dr. Weinstein's declaration shows that he reviewed the complaint, the Nursing Defendants'

8    depositions, the depositions of other nurses, and several official reports of the incident.  There is no

9    clear indication that Dr. Weinstein reviewed any medical records or other evidence of the cause of

10   death, although he does cite the autopsy report and apparently was familiar with the circumstances

11   of Mr. Washington's death.  However, on the basis of the complaint and the official reports, Dr.

12   Weinstein would have been aware of a chronology of events, including the reported actions of both

13   the Deputy Defendants and the Nursing Defendants.

14   While a jury might disagree with Dr. Weinstein's declaration and agree with Nursing

15   Defendants' arguments that other factors caused Mr. Washington's death, it is not the Court's task

16   when ruling on a motion for summary judgment to determine credibility or weigh conflicting

17   evidence.  *Porter v. California Dept. of Corrections*, 419 F.3d 885, 891 (9th Cir. 2005)

18   The Court therefore holds the evidence submitted is sufficient to withstand summary judgment.

### e.      Immunity for Emergency Services

20   Under California Civil Code § 1713.2, no person who has completed a qualified CPR course

21   and who, "in good faith, renders emergency cardiopulmonary resuscitation at the scene of an

22   emergency shall be liable for any civil damages as a result of any acts or omissions by such person

23   rendering the emergency care."  This section does not immunize CPR providers from liability from

24   gross negligence, however.

25   As discussed above, there is adequate evidence to support a finding that the Nursing

26   Defendants withheld CPR for up to seventeen minutes after it was needed.  This, combined with Dr.

27   Weinstein's declaration regarding the onset of brain and organ damage and the standard for medical

28   care in penal institutions,  (Pls.' NOL, Ex. B, at 3), is sufficient to support a finding of gross

1   negligence against the Nursing Defendants.  Therefore, this immunity will not be available as a basis

2   for granting any portion of the Nursing Defendants' motion for summary judgment.

3                    **f.    Punitive Damages**

4          Nursing Defendants finally argue that summary judgment should be granted as to Plaintiffs'

5   punitive damages claims, contending that there is insufficient evidence to meet either federal or state

6   law standards.  Under federal law, "a jury may be permitted to assess punitive damages in an action

7   under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when

8   it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*,

9   461 U.S. 30, 56 (1983).  Under California law, punitive damages may be awarded "where it is proven

10  by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or

11  malice. . . . "  Cal. Civ. Code § 3294.

12         As discussed in the Eighth Amendment analysis above, there is adequate evidence to support

13  a finding that Nursing Defendants acted with callous indifference to Mr. Washington's federally

14  protected rights, or that they were guilty of oppression or malice in failing to provide Mr. Washington

15  with adequate medical care.  Therefore, summary judgment is not proper on this request for relief.

16         **D.    Claims Against the Deputy Defendants**

17         By contrast with the Nursing Defendants, the Deputy Defendants' contacts with Mr.

18  Washington were extensive and Plaintiffs present a good deal of evidence concerning this.  Taking the

19  evidence in the light most favorable to Plaintiffs, a reasonable jury could find that the Deputy

20  Defendants initiated the contact with Mr. Washington that night, that they confiscated his photographs

21  knowing or having reason to know that they were photographs of his wife, and then subjected him to

22  excessive physical restraint and harm with little provocation.  There is some evidence to support a

23  finding that, even if the photographs were officially prohibited, at least some of the Deputy Defendants

24  had known that Mr. Washington had them and tacitly approved. (Pls.' NOL, Ex. Q, at 113[5] (interview

25  with inmate Cunningham).)  The jury might also find that the Deputy Defendants did so with little

26

27         [5] Exhibit Q consists of a series of transcripts of interviews with inmates conducted during an
    official investigation of the incident.  As submitted, this exhibit is not consecutively paginated.
28  Therefore, where particular portions of this exhibit have been cited in the pleadings or are near other
    cited portions, this order relies on those same page numbers.  Where a particular portion of a transcript
    is alluded to but the page number is unclear, the citation is marked "n.p."

                                                                                    02CV0143

1    provocation, or possibly even that they did so having knowingly and unreasonably provoked the

2    violent reaction themselves.  Still taking the evidence in the light most favorable to Plaintiffs, a jury

3    could find that the Deputy Defendants pressed his body against a wall and later put their weight on his

4    back, preventing him from breathing (Pls.' NOL, Ex. J, at HD 22); and further, in spite of his repeated

5    protests that he could not breathe, the Deputy Defendants persisted and eventually caused his death.

6          Although the evidence is in conflict, there is some evidence that the Nursing Defendants did

7    not clear Mr. Washington for placement in the safety cell, and that the Deputy Defendants therefore

8    left him there knowing that he was not being provided the necessary medical supervision.  In addition,

9    there is some evidence to support allegations that although the Deputy Defendants knew Mr.

10   Washington was in need of medical help, they failed to notify the Nursing Defendants or other nurses

11   for several minutes, which in part caused Mr. Washington's death.

12         The Deputy Defendants argue that there is no vicarious liability under § 1983, the acts and

13   omissions of each of them must be analyzed individually.  *Palmer*, 9 F.3d at 1437–38 (no vicarious

14   liability); *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be

15   individualized and focus on the duties and responsibilities of each individual defendant whose acts or

16   omissions are alleged to have caused a constitutional deprivation.") (citing *Rizzo v. Goode*, 423 U.S.

17   362, 370–71, 375–77 (1976).  However, there is some evidence to support a finding that the Deputy

18   Defendants acted in concert.  Participation in a Constitutional violation by another person will support

19   § 1983 liability.  *Leer*, 844 F.2d at 633 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)).

20         As discussed previously, the Court construes the Amended Complaint as bringing the following

21   claims against the Deputy Defendants: the federal claims for deliberate indifference to serious medical

22   needs; excessive force; and deprivation of Plaintiffs' rights to familial love, society, and

23   companionship; and the state claims for intentional infliction of emotional distress, failure to summon

24   medical care, battery, and negligence *per se*.  Except for negligence *per se*, the standards governing

25   all these claims have been discussed in connection with the Nursing Defendants.

26   / / /

27   / / /

28   / / /

02CV0143

1        **1.      Federal Claims**

2            **a.      Deliberate Indifference to Serious Medical Needs**

3            An Eighth Amendment claim for failure to provide medical care requires proof that an inmate

4    was confined under conditions posing a risk of "objectively, sufficiently serious" harm and that the

5    officials had a "sufficiently culpable state of mind" in denying the proper medical care. *Clement*, 298

6    F.3d at 904.

7            Plaintiffs present a detailed analysis of the evidence, pointing to evidence from which a jury

8    could conclude that the Deputy Defendants, conscious that they had done wrong, colluded in preparing

9    detailed "use of force" reports that omitted any mention that Mr. Washington complained about having

10   trouble breathing. (Pls.' Opp'n to Deputy Defendants' Mot. for Summ. J., at 9–10 (citing evidence).)

11    Plaintiffs point to evidence that a number of inmate witnesses said they had heard Mr. Washington

12   complaining of having trouble breathing.  (*Id.* at 10–11 (citing evidence).)  Plaintiffs further cite

13   evidence supporting a finding that the Deputy Defendants, while being investigated, were confronted

14   with this evidence and only then remembered this very significant detail.  (*Id.* at 10–12 (citing

15   evidence).)  On this basis, a reasonable jury could conclude that the Deputy Defendants initially hid

16   the significant fact that Mr. Washington said he was having trouble breathing and only admitted it

17   when they were forced to do so.  It is a general principle of evidence law that a finder of fact is entitled

18   to consider a party's dishonesty about a material fact as affirmative evidence of guilt. *Wright v. West*,

19   505 U.S. 277, 296 (1992).  A reasonable jury could therefore infer that the Deputy Defendants did not

20   promptly or properly respond to Mr. Washington's complaints about having trouble breathing.

21           It is a reasonable inference that anyone in the Deputy Defendants' position would know that

22   a person in a four-point restraint who was having trouble breathing would require immediate medical

23   attention.  It is also a reasonable inference that anyone in the Deputy Defendants' position would know

24   that even a short delay in providing medical care to someone who was having trouble breathing could

25   be dangerous.  On the basis of the evidence presented, a jury could reasonably conclude that the

26   Deputy Defendants at least initially ignored Mr. Washington's obvious physical distress, which in part

27   caused his death.

28   / / /

1    The Nursing Defendants likewise assert that they did not clear Mr. Washington to be placed

2    in the safety cell.  If the jury credits the Nursing Defendants' testimony, the jury could reasonably

3    determine on this basis and on the basis of other evidence find that the Deputy Defendants dragged Mr.

4    Washington, who was in obvious physical distress, into the safety cell and left him without the kind

5    of monitoring that they knew was needed.

6    For these reasons, summary judgment is not proper on the claim of deliberate indifference

7    to serious medical needs.

8    **b.    Excessive Force**

9    "[W]henever prison officials stand accused of using excessive physical force in violation of

10   the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied

11   in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

12   *Hudson*, 503 U.S. at 6–7.  The standard "takes into account such facts as the need for the application

13   of force, the relationship between the need and the amount of force used, the threat perceived by the

14   officer, any effort to temper the severity of the forceful response, and the extent of the injury inflicted,

15   and whether the force was applied for a legitimate purpose." *Hydrick*, 449 F.3d at 1001.

16   A jury could reasonably consider evidence tending to show the following: (1) the Deputy

17   Defendants discovered photographs rather than the potentially dangerous weapon they were searching

18   for, (2) the Deputy Defendants were told that the photographs depicted Mr. Washington's wife and at

19   least some of the Deputy Defendants knew that Mr. Washington had been permitted to possess the

20   photographs, (3) Mr. Washington attempted to appeal the confiscation of his photographs non-

21   violently, (4) his reaction was reasonable or at least predictable bearing in mind the photographs

22   depicted his wife, (5) the Deputies unreasonably used force rather than attempting to resolve the

23   dispute in some other less dangerous manner, (6) the Deputy Defendants applied force in a manner

24   known to be dangerous, (7) the Deputy Defendants failed to mitigate the dangers associated with the

25   method of restraint they chose, and (8) the force applied was in fact a cause of Mr. Washington's

26   death.

27   Deputy Defendants rely on arguments and authority that use of the four-point restraint was

28   objectively reasonable.  *See, e.g.,* Deputy Defendants' Reply at 2 (citing *Tatum v. City & County of*

1   *San Francisco*, 441 F.3d 1090 (9th Cir. 2006)). However, *Tatum* did not hold that use of the four-point

2   restraint was reasonable as a matter of law in all circumstances, but rather considered the

3   circumstances under which a control hold was used. 441 F.3d at 1095–96 (relying on specifics of the

4   circumstances of a suspect's arrest to determine objective reasonableness of the use of a control

5   hold). This Court applies the same standard. Bearing in mind the evidence, a jury could reasonably

6   determine that the Deputy Defendants applied force to Mr. Washington that was excessive under the

7   circumstances, violating his Constitutional rights.   For these reasons, summary judgment is

8   inappropriate on this claim.

9       Plaintiffs have mentioned claims for the imposition of punishment without due process of law

10  and for the imposition of cruel and unusual punishment.  However, on the facts outlined in the

11  complaint, the standards cited in *Hudson* and *Hydrick* are is the appropriate standards by which to

12  judge the Deputy Defendants' conduct. Furthermore, while Plaintiffs have both argued and briefed

13  the excessive force claim in their opposition to Deputy Defendants' motion for summary judgment,

14  they have not done so for these alternate theories.  Therefore, the Court construes these theories of

15  recovery as subsumed within the claim for excessive force.

16                      **c.    Interference With Familial Relations**

17      Plaintiffs bring this Fourteenth Amendment claim for denial of their own rights as family

18  members of Mr. Washington. *Moreland*, 159 F.3d at 371.  As noted above, the standard for such a

19  claim requires a showing that Defendants acted, not merely with conscious indifference, but out of a

20  "purpose to commit harm." *Id.* at 373.

21      As discussed in the preceding sections, there is adequate evidence to support a finding that

22  Deputy Defendants acted with at least callous indifference to Mr. Washington's safety, and that they

23  caused his death.  In addition, Plaintiffs argue extensively regarding the state of mind of the Deputy

24  Defendants as a group, citing evidence. Plaintiffs' evidence is probative of at least some of the Deputy

25  Defendants' state of mind. Plaintiffs present evidence supporting findings that the Deputy Defendants

26  were violently angry at Mr. Washington, that they applied force to him even after he was obviously

27  completely restrained, and that they taunted him. In sum, the evidence is sufficient to support a finding

28  / / /

                                    - 28 -                                      02CV0143

1 that the Deputy Defendants acted as a group and did so with a common purpose to harm Mr.

2 Washington.    Therefore, summary judgment is not proper on this claim.

3                    **d.    Qualified Immunity**

4          The Deputy Defendants have argued that they are entitled to qualified immunity.  Examining

5 their alleged actions under the standards outlined in *Saucier*, 533 U.S. at 201–05 and discussed above,

6 the Court finds that the alleged actions would violate Mr. Washington's and the Plaintiffs'

7 constitutional rights, that such rights were clearly established at the time, and that no officer in the

8 Deputy Defendants' position would reasonably have believed that his actions were Constitutionally

9 permissible.  For these reasons summary judgment on the grounds of qualified immunity is denied.

10                    **2.    State Claims**

11                    **a.    Intentional Infliction of Emotional Distress**

12          "The elements of a prima facie case for the tort of intentional infliction of emotional distress

13 are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless

14 disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

15 extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the

16 defendant's outrageous conduct." *Cervantez*, 24 Cal.3d at 593.

17          As outlined in the discussion on the Deputy Defendants' motion for summary judgment on the

18 familial rights claim, there is evidence to support a finding that the Deputy Defendants acted in concert

19 in a manner intended to harm Mr. Washington.  Furthermore, Plaintiffs cite evidence that Mr.

20 Washington was screaming, crying and pleading. *See* Pls.' NOL, Ex. Q, at 168 (interview with inmate

21 Corona) ("He was just saying 'I can't breathe. Please' you know?. . . I could hear him cry.  I never

22 heard anybody — I've never heard a man cry like that.") As discussed previously, Plaintiffs present

23 evidence to support findings that the Deputy Defendants confiscated photographs depicting Mr.

24 Washington's wife, that they intentionally harmed him and caused him to suffer, and that they yelled

25 angrily at him and taunted him as they were doing so.

26          A jury could reasonably conclude from this evidence that all required elements for a claim

27 of intentional infliction of emotional distress have been met.  Therefore, summary judgment is

28 inappropriate on this claim.

**b.      Failure to Summon Medical Care**

Under Cal. Govt. Code § 845.6 , a public employee may be liable if he "knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."

As discussed in connection with the claim against the Deputy Defendants for deliberate indifference to serious medical needs, the evidence supports a finding that the Deputy Defendants knew Mr. Washington was in physical distress and was having trouble breathing but failed to promptly summon medical staff for some time.  Although the evidence is in conflict, it also supports a finding that the Deputy Defendants failed to consult the Nursing Defendants before moving him into the safety cell.

There is no evidence to show whether the Deputy Defendants had the independent responsibility or authority to summon outside medical care even after the Nursing Defendants were involved.  However, there is at least some evidence to support a finding that the Nursing Defendants were given only limited access to Mr. Washington (Pls.' NOL, Ex. PP, at 31 (deposition of Nurse Psillas, testifying that a deputy called to tell her the nurses "can check the patient now"), and that the Deputy Defendants did not summon additional help even when the Nursing Defendants were clearly in need of it. *See* Pls.' NOL, Ex. Q, at 165 (interview of inmate Corona stating that a nurse loudly called out "Does anybody know CPR?" or "We need CPR" ); *cf. id.*, Ex. Q, n.p.[6] (interview of inmate Gomes stating that a nurse yelled "Does somebody know CPR?" even while CPR was being performed).

For these reasons, summary judgment is not appropriate on this claim.

**c.      Battery**

Under California law, "battery is a violation of an individual's interest in freedom from intentional unlawful, harmful or offensive unconsented contacts with his or her person." *Rains*, 150 Cal.App.3d at 938.  The same evidence that supports a finding of excessive force and a denial of

/ / /

---

[6] This information is found on p. 25 of a transcript of an interview of inmates in cell 102, dated February 2, 2001.  Plaintiffs mention it in their Amended Complaint without providing a specific citation.  (Am. Compl. at 8.)

1  qualified immunity likewise supports a claim for battery under this standard.  Therefore, summary

2  judgment is not proper on this claim.

### d.    Negligence *Per Se*

4      As an alternate theory of recovery, Plaintiffs bring a claim against the Deputy Defendants on

5  the basis that their negligence harmed Mr. Washington.

6      "Negligence *per se*" is not itself a cause of action.  *Quiroz v. Seventh Ave. Center*, 140

7  Cal.App.4th 1256, 1285 (Cal.App. 6 Dist. 2006).  Rather, it is an evidentiary doctrine codified at Cal.

8  Evid. Code § 669, which creates a presumption of negligence if four elements are established: (1) the

9  defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately

10  caused death or injury to person or property; (3) the death or injury resulted from an occurrence the

11  nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person

12  suffering the death or the injury to his person or property was one of the class of persons for whose

13  protection the statute, ordinance, or regulation was adopted.  *Id* (citing *Spates v. Dameron Hosp. Assn.*,

14  114 Cal.App.4th 208, 218 (Cal.App.3 Dist. 2003)).

15      Because this is a civil rights complaint, the Court construes it liberally.  *Holley*, 400 F.3d at

16  674.  Therefore, the Court construes this claim as an argument in support of a claim for negligently

17  caused wrongful death. The Deputy Defendants are alleged to have violated the County's regulations

18  regarding use of the four-point restraint, and Plaintiffs point to evidence in support of their allegation.

19  (Pls.' Opp'n to Deputy Defendants' Mot. for Summ. J., at 6 (citing Pls.' Notice of Lodgment ("Pls.'

20  NOL")), Ex. UU, at 13–14. )

21      Deputy Defendants have not addressed this claim or argument in their opposition.  Therefore,

22  while the Court construes the claim of negligence *per se* as a claim for wrongful death, summary

23  judgment is denied.

### e.    Punitive Damages

25      The Deputy Defendants have moved for summary judgment on Plaintiffs' claim for punitive

26  damages, arguing that the standards under federal and state law have not been met, and cite the same

27  authorities as do the Nursing Defendants.  For reasons discussed in the previous sections, there is

28  adequate evidence to support an award of punitive damages against the Deputy Defendants.

02CV0143

## VI.   Conclusion and Order

In its order of August 22, 2006, the Court previously ruled on these claims. The Court now reiterates and amplifies its order here.

The County's motion for summary judgment on Plaintiffs' *Monell* claims is **GRANTED**. The County's motion for summary judgment on the claim that its employees failed to summon medical care is **DENIED**. The County's motion for summary judgment on all other respondeat superior claims is **GRANTED**.

The Nursing Defendants' motion for summary judgment on Plaintiffs' Eighth Amendment excessive force claim is **GRANTED**. The Nursing Defendants' motion for summary judgment on the Eighth Amendment deliberate indifference to medical needs claim is **DENIED**. The Nursing Defendants' motion for summary judgment on the Fourteenth Amendment interference with familial relations claim is **GRANTED**. The Nursing Defendants' motion for summary judgment on the intentional infliction of emotional distress claim is **GRANTED**. The Nursing Defendants' motion for failure to summon medical help is **GRANTED** in part and **DENIED** in part: it is **DENIED** with respect to the claim that they failed to summon outside medical assistance after the decedent Marshawn Washington stopped breathing, but **GRANTED** as to the remainder of the claim. The Nursing Defendants' motion for summary judgment on the battery claim is **GRANTED**. The Nursing Defendants' motion for summary judgment on the medical negligence claim is **DENIED**. The Nursing Defendants' motion for summary judgment on grounds of qualified immunity and immunity for emergency services is **DENIED**.

The Deputy Defendants' motions for summary judgment on the following claims are **DENIED**: Eighth Amendment claim for deliberate indifference to serious medical needs, Eighth Amendment excessive force claim, Fourteenth Amendment interference with familial relations claim, intentional infliction of emotional distress, failure to summon medical help, battery, and negligence *per se*. The Deputy Defendants' motion for summary judgment on grounds of qualified immunity is **DENIED**.

Although the Court's order of August 22, 2006 did not expressly say so, Plaintiffs' request for punitive damages is construed as applying only to the Nursing Defendants and Deputy Defendants, and summary judgment is **DENIED** as to this request.

02CV0143

1    The Court construes Plaintiffs' claims as limited to the above.  Plaintiffs' generalized claim

2 for wrongful death is subsumed within their civil rights violation theories under which it is pursued,

3 as well as under their claim against the Deputy Defendants under the caption "negligence *per se*."  The

4 Court finds any other claims Plaintiffs may have intended to raise are unsupported by the pleadings

5 and evidence, and Defendants are entitled to judgment as a matter of law on any such claims.

6

7    **IT IS SO ORDERED**.

8 DATED:    9-8-06

9

10    **HONORABLE LARRY ALAN BURNS**
      United States District Judge

11 cc:    Magistrate Judge Jan M. Adler
         All Counsel of Record

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

02CV0143